# Morgan-Abbott Barker Company v. Southwest Cracker Company.

(Decided June 12, 1928.)

## Appeal from Jefferson Circuit Court (Common Pleas Branch First Division).

1. Sales.—Where jobber purchased a large quantity of soft drink on salesman's representations that it was salable, that he would see to it that it was sold, and agreement to spend enough time with jobber's salesmen to teach them how to sell it, held, that jobber had only a reasonable time after receiving shipment to determine whether the drink was salable, and, when salesman had spent reasonable time in instructing jobber's salesmen how to sell the drink, he had fully performed his contract.

2. Sales.—Alleged understanding between jobber and defendant's salesman under which jobber was "to be entirely taken care of" on sale of soft drink purchased from defendant, and agreement that jobber would not suffer one cent of loss on the merchandise at any time, held too indefinite to be construed as an agreement by defendant to pay any loss which jobber might sustain.

3. Sales.—Where goods are sold for shipment to buyer, and buyer, after having inspected goods, or after having had a reasonable opportunity to do so, accepts and appropriates them to his own use, he is liable for the contract price, and may not claim damages for breach of warranty, expressed or implied.

4. Compromise and Settlement.—Settlement between jobber and manufacturer for large quantity of soft drink purchased by jobber, involving allowance of credits for beverage which had spoiled, made over seven months after jobber received shipment, held to preclude any defense that jobber might have made to payment of bill or to maintain independent suit to recover purchase price after payment, for breach of warranty respecting goods which had spoiled after the settlement.

5. Compromise and Settlement.—In jobber's action against manufacturer of soft drinks to enforce manufacturer's alleged agreement at time of settlement between parties to repurchase such part of beverage as remained unsold after reasonable time or to refund

purchase money thereon, evidence held insufficient to take case to jury.

ARTHUR M. RUTLEDGE and O'NEAL & O'NEAL for appellant.

GIFFORD & STEINFELD for appellee.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing.

Appellant, through it salesman, W. H. Barker, who was a member of the firm, sold to appellee 2,720 gallons of beverage known as "Ginger Hot." Shipment was made on October 14, 1920. The net purchase price for this quantity of the beverage was $2,444.52. The shipment was received by appellee about ten days later. It was unloaded from the car, and placed in the custody of appellee.

The appellee at the time was located in Wichita, Kan., and it was a wholesaler of candies, cakes, crackers, and other like articles. The appellant at the time had its headquarters in Louisville, Ky., and it was engaged in manufacturing and selling to jobbers soft drinks, including a drink known as "Fruit-Trola," and the beverage mentioned above as "Ginger Hot." When the shipment of "Ginger Hot" was received by appellee it proceeded to place the drink upon the market by selling it to customers. The sales were made by the salesmen of appellee, but they were assisted by W. H. Barker, who was a salesman for appellant. The purchase price for this shipment was fully paid by appellee on December 8, 1920.

In the later part of November, 1920, appellee gave to appellant another order for the same beverage, and the quantity ordered at this time was 3,200 gallons. Shipment was made in accordance with the last order on December 6, 1920. This shipment arrived about ten days after it left Louisville, and it was accepted and unloaded from the car. It was disposed of, in so far as it was disposed of at all, in the same manner as the first shipment; that is, an attempt was made to place it on the market through the salesmen of appellee, assisted by W. H. Barker, salesman for appellant.

The drink did not sell as had been hoped; the result being that a large quantity of the beverage was left on the hands of appellee unsold. Some that was sold did not prove satisfactory, and was returned by the purchaser

to appellee. Little, if anything, was said about dissatis-
faction on the part of appellee during the winter of 1920-
1921. The matter appears to have stood in abeyance for
a few months, all of which is explained by appellee's
general manager, D. K. Oxley, in his. evidence. On July
21, 1921, W. H. Barker called on appellee at its office in
Wichata, Kan., and he and Mr. Oxley went over mat-
ters. There appears to have been a full and free dis-
cussion of the account. Appellee claimed credits by a
large number of items, which were finally allowed. The
conclusion of the whole matter was that appellee gave
appellant a check, or rather two checks, for the entire
amount shown to be due appellant after deducting certain
items which had been the subject of discussion between
Mr. Oxley and Mr. Barker. The checks aggregated $2,-
245.30. This squared the account, and should have been
the end of the matter according to the contention of ap-
pellant, but, according to the contention of appellee, there
were certain understandings, warranties, agreements,
and representations made prior to the settlement and
simultaneously therewith which left the account far from
settled.

In September, 1922, appellee instituted this suit, and
the cause of action set out in the petition was that appel-
lant had guaranteed the quality of "Ginger Hot;" that
is, that it would not sour or become stale, and that it con-
formed to the pure food laws of the federal government,
and the state of Kansas. It is further alleged that appel-
lant had agreed that Barker should assist in selling the
drink, and that appellant guaranteed that it would be
sold at a profit within a reasonable time. A breach of the
warranty is alleged in that the drink became sour, stale,
and unsalable and that appellee had left on its hands
3,584 gallons of "Ginger Hot," which at the purchase
price was worth $3,404.80. For this sum appellee asked
judgment. In January, 1924, an amended petition was
filed elaborating the grounds alleged in the original peti-
tion and pleading more definitely that the beverage could
not be sold in Kansas without violating the pure food
laws of that state. Appellee appears to have had in mind
that its best chance to recover was on the allegation that
appellant had represented that the sale of the drink was
permissible under the pure food laws when as a matter
of fact such was not true. A second amended petition
was filed in February, 1925, and it is there alleged that

Barker, acting for appellant, agreed that it would take back any of the unsold part of the drink the appellee could not dispose of, or would refund the purchase price on such part as was not sold or disposed of profitably by the appellee within a reasonable time after it was delivered. The last-mentioned amended petition contains the further allegation that appellant agreed to protect appellee against any loss in handling this drink. A third amended petition was filed in March, 1927, which is, in a measure at least, a repetition of the allegations of the second amended petition. It is specifically alleged that appellant agreed that it would repurchase from appellee any of the drink not sold within a reasonable time, and that appellant agreed to repay appellee for any portion of the drink remaining unsold after a reasonable time.

Appellant traversed the allegations in the petition and amended petitions, and relied on a plea of settlement. It also pleaded a set-off of $318 due on a bill for "Fru-Trola" sold to appellee in July, 1921.

Appellee introduced its evidence, but appellant offered none. At the conclusion of the evidence offered by appellee the court overruled a motion by appellant for a directed verdict in its favor. The court gave an instruction directing the jury to return a verdict for appellee in the sum of $3,147.80, subject to a credit of $318.20, or a net sum of $2,829.60.

The appellant relies for a reversal mainly on the ground that the evidence offered by appellee did not justify a recovery, and that the jury should have been instructed to return a verdict for appellant. It also relies on the ground that the amount fixed in the verdict under the instructions of the court is not the correct amount which should have been found against it even if the evidence justified a recovery.

This is a most unusual case, and counsel for appellant and appellee have experienced difficulty in locating the cause of action or grounds of defense under any well established and defined branch of the law. The facts are unusual and the transaction is such as to leave the question surrounded with much doubt as to the correct principles governing. Mr. Oxley testified with a degree of fairness which is commendable, and we believe he has placed the facts fairly in the record; and whether appellee has a cause of action or not depends upon the transactions as detailed by Mr. Oxley. At the outset it may be observed that his evidence hardly squares itself with

the allegations in the pleadings. That he acted in the utmost good faith, and probably under the belief that his company would not be subjected to any loss, is apparent. But one acting in good faith and under such a belief may so act that the law will not protect him in what he believes are his rights. A reading of this record is rather convincing that appellee has just cause of complaint, but it may be that it has not so acted as to preserve its rights so that a court may grant relief. The entire transaction was one of indefinite arrangements, and it is hard to determine just the intention of the parties at the time of the transactions detailed in the evidence. Mr. Oxley testified that he had been dealing with appellant for about a year and a half before he made the first order for "Ginger Hot." He had purchased from appellant a drink known as "Fru-Trola." He had purchased five or six carloads of this particular drink. When he purchased the "Ginger Hot" he understood that it was purchased upon the same agreement as he had previously purchased "Fru-Trola." Mr. Oxley stated that Mr. Barker came to his office in the spring or summer of 1919, and exhibited to him a sample of "Fru-Trola." Barker's proposition was that he would sell the "Fru-Trola" to appellee, which was a jobber with a sales organization in that territory, and that appellee should place the drink on the market through its customers. It agreed to make the purchase on the basis that Barker would come into the territory and work with the salesmen of appellee and sell the drink. Appellee's salesmen were inexperienced in the sale of soft drinks. After the first shipment of "Fru-Trola" Barker went into the territory and traveled with two of the salesmen of appellee. The first shipment or two seemed to please the public, and this led to other purchases. Two cars were shipped, which were spoiled on their arival, as something had gone wrong with the manufacturing process and the drinks had fermented to such an extent that the heads were blown out of some of the kegs. Being pressed for more definite statements as to the agreement in connection with the purchase of "Fru-Trola," Mr. Oxley stated:

"Our agreement with Mr. Barker as an officer of the company at all times was that we were to be entirely taken care of on the product; that we were buying it and it was something we knew nothing about, and we were buying it on his representation

as an officer of the firm, that the drinks were salable and that he would see to it that they were sold either by coming and traveling with our men and selling it himself, or traveling with our men to the extent that he could sell the drink to them—to the extent that they could go out and sell it; and that we would not suffer one cent loss on the merchandise at any time.''

An analysis of this statement of Mr. Oxley does not afford a very definite understanding of the arrangements between the parties. The statement that appellant was ''to be entirely taken care of on the product'' may have meant something between the parties, but it cannot be made the basis of recovery unless there is some further explanation as to what was meant by the language. It is true he stated that appellee was buying the drink on the representation of Barker that it was salable and that he would see to it that it was sold. He agreed to either come into the territory and sell it himself, or to spend enough time with the salesmen of appellee to teach them how they could sell it. It appears to the court that appellee had only a reasonable time after the shipment to determine whether the drink was salable, and that when Barker had spent a reasonable time in instructing the salesmen of appellee how to sell the drink he had fully complied with his contract. It is true that Mr. Oxley said that it was also a part of the understanding that appellee would not suffer one cent of loss on the merchandise at any time. While the court does not question the correctness of that statement, it is indefinite, and the court could not well say that it could be construed as an agreement on the part of appellant to pay any loss which appellee might sustain.

Mr. Oxley stated that appellant satisfactorily arranged the loss of the two cars which were spoiled upon arrival. That is not material in this case, as the shipment was in bad condition when it reached appellee, and the loss naturally fell upon appellant. He stated that other adjustments were made to the satisfaction of his company. The arrangements for the sale of ''Fru-Trola'' worked out satisfactorily.

In testifying about the purchase of ''Ginger Hot,'' Mr. Oxley stated: That Barker came to his office in the fall of 1920 with the drink, which he stated was a cold weather drink. Mr. Oxley sampled it and found it so unpalatable that he expressed the opinion that no white person would drink it because he liked it. Barker sug-

gested that down in Oklahoma and Texas there was a Mexican population accustomed to drinking such beverages and that it could be disposed of down there. Barker suggested the shipment of a car on the same terms as that governing the shipments of "Fru-Trola." Appellee ordered a car of "Ginger Hot." He stated that Barker represented that it was a "ginger drink," and that he assumed that it was made out of real ginger. That he further represented that it was a good quality drink. Barker did not state anything definite as to its keeping properties, but he stated that he would see that the drink was sold. The drink was shipped, as before stated, in the latter part of the year 1920. It was discovered that it had gone bad; that is, that it had soured and become unfit for use entirely, in 1922. After the first shipment Mr. Oxley stated that Barker came into the territory about the middle of November, and that he went on the road with one of the salesmen of appellee. While Barker was on the road he called Mr. Oxley by telephone and said that the sales were going good, and suggested the purchase of another car. When Mr. Oxley hesitated about giving the order for another car, Barker told him that he was going to sell it for him just the same as he always had, and with that assurance the second shipment was ordered.

A considerable quantity of the material embraced in the two shipments had been sold in the winter of 1921. The sales ceased when warm weather came on. On the 21st day of July, 1921, Barker went to the office of appellee in Wichita, and it appears there was a complete settlement made at that time between Mr. Barker, representing appellant, and Mr. Oxley, representing appellee. A credit of $804.95 was allowed on the bill for freight, spoilage, and other adjustments, and a discount of $149.75 was also allowed, which reduced the amount of the bill to $2,245.30, which was paid. Mr. Oxley admitted in his evidence that this was a complete settlement. Unless there was something done simultaneously with this settlement which rendered appellant liable for any loss that it might sustain on the quantity of "Ginger Hot" then on hand, appellee cannot maintain its cause of action. Mr. Oxley stated that:

> "The settlement covered our loss on everything except the merchandise that we had in stock at that time; that is, the 'Ginger Hot' we had in stock at that time."

He stated that his company had 3,584 gallons in stock, which amounted at the invoice price to $3,404.80. Appellee was not able to sell that quantity. Appellee did not know the condition of the drink at the time the settlement was made, and Mr. Oxley stated that he presumed it was in the same condition it was when it was shipped, and that no examination was made of it at the time of the settlement. He stated that Mr. Barker was to return the following winter to continue his work in the field in selling the drink. He stated that he offered to return the quantity of the drink that his company had on hand at the time of the settlement, but Mr. Barker suggested that he not return it, and put it in on the basis of a personal favor to him that he keep it and pay for it. He assured Mr. Oxley that he would return in the fall and would again travel out with the salesmen of appellee. Barker did return in the late fall and went out with the salesmen of appellee, but he did not sell a great quantity of the drink. When he came into the office of appellee, Mr. Oxley offered again to return the unsold drinks. Barker told him that he did not think he should attempt to do anything more on account of the depressed business conditions, but that he would return after the first of the year. Mr. Oxley told him that he did not think the drink would sell in the territory, and that he would like for Barker to return the money or to replace the ''Ginger Hot'' with ''Fru-Trola.'' Barker declined to accede to the suggestions made by Mr. Oxley, again assuring him that the drink would sell after the first of the year, as he would come back and go out with some of the boys that he had not been out with previously. He also said that he was going to Colorado and he thought he could sell a quantity of ''Ginger Hot'' there. This was in the fall of 1921 and Mr. Barker did not thereafter return. When appellee attempted to place the drink on the market in 1922, it discovered that it had turned to vinegar, or had changed to a state similar to vinegar. Mr. Oxley stated that he made an effort to get Barker to come back or to take the ''Ginger Hot'' off of his hands, but he does not state any details. He stated he had some correspondence with him; but no letter writen by appellee is placed in the record.

A letter written by Barker of date June 15, 1920, is placed in the record. That was more than a year before the first shipment of ''Ginger Hot.'' The letter written by appellant at that time appears to refer to the shipment

of "Fru-Trola" which was spoiled. The letter suggested that the salesman of appellee be instructed to tell the customers to keep "Fru-Trola" and that, if it became sour on their hands, appellee would make it good. There is nothing in that letter which sheds any light on this controversy, other than the suggestion that appellant made good any loss on "Fru-Trola." Appellant likewise made good any loss on "Ginger Hot" up to the time of the settlement in July, 1921. The next letter which is placed in the record was written by Mr. Barker on March 10, 1922. It was written in response to a letter from appellee. Complaint had been made about the condition of the "Ginger Hot" and Mr. Barker suggested in his letter that appellee caused about five pounds of sugar to be placed in each keg that had soured. Another letter written by Barker on August 11, 1922, is placed in the record. In this letter surprise is expressed at the position taken by appellee relative to the sale of the "Ginger Hot." He also expressed surprise that it was claimed that he had made false statements in making the settlement and he asked for an explanation. He then pointed out in his letter that the only statement he made was that he would try to dispose of some of the "Ginger Hot" in Colorado. He went into an explanation as to why the "Ginger Hot" did not sell readily, claiming that it was on account of the depressed business conditions. Certainly there is nothing in the letter which would indicate that appellant had violated any agreement which was made at the time of the settlement.

If this case is governed by the ordinary law of sales, appellee has no grounds on which to base a recovery. Where goods are sold for shipment to the purchaser, and the purchaser, after having inspected the goods, or after having had a reasonable opportunity to do so, accepts and appropriates them to his own use, he is liable for the contract price, and he may not claim damages for a breach of warranty, either expressed or implied. No rule is better settled. It has been recently restated in the case of Hamersley Mfg. Co. v. Lobaco Co., 213 Ky. 159, 280 S. W. 945, where many of the authorities on the question are cited. Again, in the still later case of Iowa Gas & Electric Co. v. Wallins Creek Coal Co., 222 Ky. 635, 1 S. W. (2d) 1056, the same principle was announced, and additional authorities are therein cited. The cases relied on by appellee in the case are distinguished from the general rule in the last-cited case.

It is contended by counsel for appellee that the rule above announced applies only to such things as may be inspected in the ordinary course of business before they are accepted, and that it does not apply to defects which could not be discovered by ordinary care in the usual course of business when the goods are received. That is true; but in this case the appellee certainly had all the opportunity that any one could wish to determine the quality of the drink which it had purchased in the more than seven months that it kept the shipment in its possession, and before it made settlement and paid for it. The sale in this case did not embrace merchandise where the defects, if any, could be discovered only in the using. The settlement, therefore, precluded any defense that appellee might have to the payment of the bill, and, if precluded from resisting the payment of the bill, it could not maintain an independent suit to recover the purchase price after payment.

This reduces the case solely to the question as to whether appellant in effect agreed at the time of the settlement, and as a part thereof, that it would repurchase from appellee such of the beverage as remained unsold after a reasonable time or that it would refund the purchase money on such as remained unsold after a reasonable time. That is the real basis of the cause of action stated in the pleadings. Appellee may have had the impression that its money would be refunded; but the payment of the money under the terms of a sale such as appellee claims it understood this sale to be is unusual. It is, indeed, unusual that appellee parted with its money and took a chance on recovering it in the event there was a breach of some agreement. It appears to the court that appellee relied on something not expressed in any agreement, and that it went largely on an assumption which existed in the mind of Mr. Oxley rather than upon any expressed or implied agreement. The evidence was not sufficient to take the case to the jury, and the court should have sustained the motion for a peremptory instruction, and the jury should have been directed to return a verdict in favor of appellant. If on another trial the evidence is the same, or substantially the same, the court will direct a verdict for the appellant.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.